**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **H.C., R.H., C.B., A.D., S.M., D.B., and G.H., on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**HON. BRIAN CHUDZIK, HON. EDWIN TOBIN, HON. MILES BIXLER, and HON. ANDREW LeFEVER, in their official capacities as Magisterial District Judges; LANCASTER COUNTY; and CHERYL STEBERGER, in her official capacity as Warden of the Lancaster County Prison,**<br><br>**Defendants.** | **Case No. 5:22-cv-1588**<br><br>**CLASS ACTION** |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiffs H.C., R.H., C.B., A.D., S.M., D.B., and G.H.,[1] by their undersigned counsel, bring the present Class Action Complaint for equitable relief on behalf of themselves and all others similarly situated.

### I. INTRODUCTION

Plaintiffs are individuals incarcerated in Lancaster County Prison ("LCP") for one reason: they cannot afford to pay their bail. Defendants Chudzik, Tobin, Bixler and LeFever are each magisterial district judges ("MDJs") in Lancaster County who imposed cash bail on Plaintiffs—and many other individuals—in hurried, cursory, and difficult-to-understand preliminary arraignments, without the presence of counsel, and without inquiry into factors that MDJs are

---

[1] Plaintiffs, by their counsel, have filed a Motion to Proceed under Pseudonyms contemporaneously with the filing of this Complaint.

required to consider under state and federal law, including Plaintiffs' alleged danger to the community, risk of flight, *and* ability to pay.  Defendants' inadequate practices and procedures result in the unnecessary and unconstitutional pretrial incarceration of hundreds of people every year.

Both the United States and Pennsylvania Constitutions recognize a fundamental interest in pretrial liberty.  Pennsylvania's Constitution entitles arrested people to pretrial release on "sufficient sureties," except in the limited cases where (1) the crime alleged is punishable by death or life imprisonment, or (2) *no* set of conditions other than imprisonment will reasonably ensure the public's safety.  Pa. Const. art. 1, § 14.  "To determine . . . what conditions, *if any*, to impose" on defendants who do not fall into those limited exceptions, MDJs must "consider *all available information* . . . relevant to the defendant's appearance or nonappearance at subsequent proceedings" including, among other things, "the defendant's . . . financial condition*,*" "family relationships," "mental condition," community ties, and addiction status.  Pa. R. Crim. P. 523(A) (emphasis added).  Before detaining anyone on unaffordable cash bail, the Due Process Clause of the Fourteenth Amendment thus requires judges to provide the defendant an opportunity to be heard and to conduct a meaningful, individualized inquiry into whether the person poses an unmanageable flight risk or danger to the community and whether less-restrictive conditions could adequately address any such risks or dangers.

Yet, Defendant MDJs conduct no such inquiry when imposing unaffordable cash bail, including in Plaintiffs' cases.  The vast majority of preliminary arraignments last only minutes with many individuals appearing by video from a terminal at LCP accompanied by correctional officers and always without court-appointed counsel.  In these very brief proceedings, Defendant MDJs ask arrested people virtually nothing about their financial condition, individual

2

circumstances, or anything else.  They give arrested people no meaningful opportunity to present information that is critical to the bail decision.  Indeed, Defendant MDJs make no findings on the record to justify the imposition of cash bail.

Instead, Defendant MDJs default to ordering cash bail in amounts that people cannot possibly pay, without providing any justification for its imposition.  Some arrested people have the means to pay the amount of cash bail chosen by the MDJ at their arraignment, and thus can purchase their release.  For many arrested people, however, the routine imposition of cash bail is unaffordable and operates as a *de facto* detention order.  Although arrested people have a theoretical opportunity to challenge the initial bail determination at a subsequent preliminary hearing, that hearing is typically not scheduled to occur until *two weeks* after the preliminary arraignment and is often postponed even longer.  To complicate matters further, there is no record or transcript of the preliminary arraignment and therefore no meaningful opportunity for subsequent judicial review.

Because of Defendants' unconstitutional practices and procedures, Plaintiffs have been in jail pending trial for weeks and even months.  Even though they are eligible for release under Pennsylvania law, they remain incarcerated because they cannot afford to pay the bail—ranging from $5,000 to $2,000,000—arbitrarily imposed by Defendant MDJs.  Pretrial detention has caused and continues to cause them significant harm.  In addition to losing their freedom, people incarcerated pretrial risk losing their jobs, homes, and ability to care for their children and other loved ones each day they remain in jail.  Extended pretrial detention at LCP also coerces incarcerated people to accept guilty pleas for "time served" simply to obtain their freedom.  Meanwhile, individuals who have the financial means to pay their cash bail avoid these harms by purchasing their release pending trial.

Plaintiffs challenge Defendant MDJs' policy and practice of routinely and arbitrarily imposing cash bail on individuals who appear at preliminary arraignments without: (1) giving them notice and a meaningful opportunity to be heard; (2) appointing counsel to those who cannot afford to hire an attorney; and (3) making all required individualized findings regarding danger to the community, risk of flight, ability to pay, and whether less restrictive conditions would reasonably ensure their appearance.  Plaintiffs seek to represent a class of individuals who are currently detained pretrial on unaffordable cash bail imposed pursuant to these practices by Defendant MDJs at preliminary arraignments.  Plaintiffs seek a declaratory judgment that this practice, and Plaintiffs and class members' continued incarceration, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  Plaintiffs also seek a permanent injunction (1) requiring Lancaster County timely to provide counsel to indigent arrested persons for preliminary arraignments, as required by the Sixth Amendment; and (2) prohibiting Defendant Steberger, the warden of the Lancaster County Prison, from executing detention orders by the Defendant MDJs that do not comply with due process, equal protection, and the Sixth Amendment right to counsel.

## II.      JURISDICTION AND VENUE

1.      This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201 *et seq.*, and the Sixth and Fourteenth Amendments to the United States Constitution, seeking declaratory and injunctive relief.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).

3.      Venue in this court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part (if not all) of the events and omissions giving rise to this action occurred in Lancaster County, Pennsylvania, located within the Eastern District of Pennsylvania.

### III.        PARTIES

4.        **H.C.** is a 46-year-old white man who has been incarcerated in the LCP since March 19, 2022, because he cannot afford to pay his bail.

5.        H.C. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

6.        **R.H.** is a 54-year-old Black man who has been incarcerated in the LCP since March 20, 2022, because he cannot afford to pay his bail.

7.        R.H. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

8.        **C.B.** is an 18-year-old Black man who has been incarcerated in the LCP since January 11, 2022, because he cannot afford to pay his bail.

9.        C.B. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

10.        **A.D.** is an 18-year-old Hispanic man who has been incarcerated in the LCP since March 29, 2022, because he cannot afford to pay his bail.

11.        A.D. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

12.        **S.M.** is a 24-year-old Black man who has been incarcerated in the LCP since March 29, 2022, because he cannot afford to pay his bail.

13.        S.M. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

14.        **D.B.** is a 39-year-old Black man who has been incarcerated in the LCP since March 29, 2022, because he cannot afford to pay his bail.

15.    D.B. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

16.    **G.H.** is a 34-year-old white man who has been incarcerated in the LCP since April 19, 2022, because he cannot afford to pay his bail.

17.    G.H. brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' unlawful pretrial detention scheme.

18.    **Defendant MDJ Brian Chudzik** is a Magisterial District Judge in Lancaster County, overseeing Magisterial District 02-2-05 and hearing cases in Lancaster, PA.

19.    In his capacity as a magisterial district judge, MDJ Chudzik is responsible for conducting preliminary arraignments of arrested persons, making initial bail determinations, conducting preliminary hearings, and ensuring the appointment of counsel for indigent defendants.

20.    He is sued for declaratory relief in his official capacity.

21.    **Defendant MDJ Edwin Tobin** is a Magisterial District Judge in Lancaster County, overseeing Magisterial District 02-2-08 and hearing cases in Lititz, PA.

22.    In his capacity as a magisterial district judge, MDJ Tobin is responsible for conducting preliminary arraignments of arrested persons, making initial bail determinations, conducting preliminary hearings, and ensuring the appointment of counsel for indigent defendants.

23.    He is sued for declaratory relief in his official capacity.

24.    **Defendant MDJ Miles Bixler** is a Magisterial District Judge in Lancaster County, overseeing Magisterial District 02-1-03 and hearing cases in Columbia, PA.

25.    In his capacity as a magisterial district judge, MDJ Bixler is responsible for conducting preliminary arraignments of arrested persons, making initial bail determinations, conducting preliminary hearings, and ensuring the appointment of counsel for indigent defendants.

26.    He is sued for declaratory relief in his official capacity.

27.    **Defendant MDJ Andrew LeFever** is a Magisterial District Judge in Lancaster County, overseeing Magisterial District 02-2-04 and hearing cases in Lancaster, PA.

28.    In his capacity as a magisterial district judge, MDJ LeFever is responsible for conducting preliminary arraignments of arrested persons, making initial bail determinations, conducting preliminary hearings, and ensuring the appointment of counsel for indigent defendants.

29.    He is sued for declaratory relief in his official capacity.

30.    All references to "Defendant MDJs" in the Complaint refer to Defendants Chudzik, Tobin, Bixler, and LeFever individually and together.

31.    **Defendant Lancaster County** operates the Lancaster County Public Defender's Office.

32.    Pennsylvania law requires Lancaster County to furnish legal counsel to any person who, for lack of sufficient funds, is unable to obtain legal counsel whenever such representation is constitutionally required.  *See* Public Defender Act, 16 P.S. §§ 9960.3, 9960.6.

33.    Lancaster County is sued for injunctive and declaratory relief.

34.    **Defendant Cheryl Steberger** is the warden of the LCP.

35.    Warden Steberger has custody of individuals in Lancaster County during their booking into the LCP and for the duration of their pretrial detention.

36.    She executes Defendant MDJs' orders by detaining Plaintiffs and other individuals who have been arrested and cannot pay the money bail required by Defendant MDJs.

37.    Warden Steberger is sued in her official capacity for injunctive and declaratory relief.

IV.        FACTUAL BACKGROUND

A.     **The Bail Process in Lancaster County**

38.     The Defendant MDJs regularly assign cash bail in amounts that indigent arrested people cannot afford—without ensuring presence of counsel, without considering required factors and alternatives, and without satisfying other crucial procedural safeguards.

39.     In Lancaster County, MDJs preside over preliminary arraignments.

40.     Preliminary arraignments generally occur within forty-eight hours of an arrest.

41.     At the preliminarily arraignment, the MDJ reads the charges and the affidavit of probable cause.

42.     The MDJ then determines whether the defendant is entitled to pretrial release and what conditions, if any, to impose.

43.     Article 1, Section 14 of the Pennsylvania Constitution provides that "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community . . ."

44.     To determine what release conditions will be "sufficient sureties," Pennsylvania Rule of Criminal Procedure 523(A) requires that the MDJ:

> consider all available information as that information is relevant to the defendant's appearance or nonappearance at subsequent proceedings, or compliance or noncompliance with the conditions of the bail bond, including information about:
>
> > (1) the nature of the offense charged and any mitigating or aggravating factors that may bear upon the likelihood of conviction and possible penalty;
> >
> > (2) the defendant's employment status and history, and financial condition;
> >
> > (3) the nature of the defendant's family relationships;
> >
> > (4) the length and nature of the defendant's residence in the community, and any past residences;

(5) the defendant's age, character, reputation, mental condition, and whether addicted to alcohol or drugs;

(6) if the defendant has previously been released on bail, whether he or she appeared as required and complied with the conditions of the bail bond;

(7) whether the defendant has any record of flight to avoid arrest or prosecution, or of escape or attempted escape;

(8) the defendant's prior criminal record;

(9) any use of false identification; and

(10) any other factors relevant to whether the defendant will appear as required and comply with the conditions of the bail bond.

45.     Additionally, before an MDJ can impose a monetary condition of bail, Pennsylvania Rule of Criminal Procedure 528(A)(2) requires the MDJ to consider "the financial ability of the defendant."

46.     Only then can the MDJ set a monetary condition in an amount that is "reasonable" in light of the accused person's financial circumstances.  *Id.* at 528(B).

47.     Due process requires that before depriving presumptively innocent people of their rights to liberty and reasonable bail, courts must give the arrested person a meaningful opportunity to be heard and then make an individualized bail decision.

48.     Yet, as alleged in detail below, Defendant MDJs frequently ignore entire categories of information needed to make these determinations and fail to give arrested people adequate opportunities to bring crucial facts to their attention.

49.     Instead, Defendant MDJs regularly impose cash bail via a summary procedure that lacks any of the hallmark protections that are required before the government can constitutionally deprive a person of their liberty.

50.     Preliminary arraignments are typically conducted outside the view of the public.

51.     Preliminary arraignments are not officially recorded or transcribed.

9

52.     Arrestees usually appear remotely by video, often from an open cubicle located within LCP.

53.     Lancaster County does not appoint counsel to represent indigent people at preliminary arraignments.

54.     The entire proceeding generally lasts only a few minutes (at most), regardless of the charges, the individual's financial circumstances, or other personal history relevant to a bail determination.

55.     As a matter of course, Defendant MDJs typically impose one of two forms of cash bail: (1) a "10%" bail condition, which requires the arrested person to post at least 10% of the total bail amount; or (2) a "straight" cash bail condition, which requires payment of the entire bail amount.

56.     Although each option can be paid with either cash or a bond, both require an immediate out-of-pocket financial expenditure by the arrested person or by their family, either in the form of money paid directly to the government or money paid to a bondsman as a nonrefundable fee.

57.     Individuals who can afford to pay the cash bail or hire a bail bond company are released once cash bail is paid.

58.     People who cannot afford to pay the cash bail, however, remain incarcerated until the resolution of their case, unless a judge later reduces their bail amount.

59.     A detained person's next opportunity to appear in court and challenge the initial

bail determination is the preliminary hearing, nominally scheduled **two weeks** after the preliminary

arraignment.[2]

60.     In reality, preliminary hearings in Lancaster County are often continued, further

prolonging a defendant's wait for a next court appearance.

61.     During that time, people languish in jail under the arbitrary and inadequate de facto

detention orders imposed by Defendant MDJs at constitutionally deficient preliminary

arraignments—solely because they cannot afford to pay cash bail.

**B.      Defendant MDJs Routinely Impose Cash Bail Without Adequate Procedural
         Safeguards.**

**i.      MDJs Deny Arrested People Procedural Due Process and Fail to Consider
         Mandatory Bail Factors, Including Risk of Flight, Danger to the
         Community, and Ability to Pay.**

*Denial of Meaningful Opportunity to Be Heard*

62.     Defendant MDJs regularly conduct preliminary arraignments in a manner that does

not provide arrested people with meaningful notice or an opportunity to be heard.

63.     Most arrested people appear at preliminary arraignments by video, alone,

uncounseled, and surrounded by correctional officers at LCP.

64.     Preliminary arraignments conducted by Defendant MDJs normally last just a few

minutes—sometimes even less.

65.     For example, C.B.'s preliminary arraignment before MDJ Tobin lasted less than a

minute.

---

[2] If an individual is represented by counsel, their lawyer can file a motion for bail modification at
any time. As explained above, however, Lancaster County does not appoint counsel to indigent
defendants until the preliminary hearing.

66.     Defendant MDJs routinely fail to provide arrested people with an adequate explanation of the preliminary arraignment process, including failing to inform arrested persons of what information they could provide that would be relevant to their bail determinations.

67.     Upon information and belief, Defendant MDJs frequently impose monetary bail with no information about the arrested person appearing before them except the arrested person's name, the offense for which they are charged, and the person's publicly available criminal history.

68.     Defendant MDJs regularly lack or fail to give meaningful consideration to other information about the arrested person—including, among other things, the arrested person's financial circumstances, family relationships, connection to the neighborhood, health conditions, and addiction history—even though this information is essential to assessing their risk of flight, danger to the community, and ability to pay cash bail, as well as the feasibility of less-restrictive alternatives.

69.     For example, MDJ Chudzik assigned $100,000 in straight cash bail at H.C.'s preliminary arraignment, without asking H.C. any questions, "due to the severity of the crime."

70.     Similarly, MDJ Chudzik assigned $100,000 in straight cash bail for an unemployed man on food stamps without any inquiry into the man's circumstances because he "didn't like" the nature of the man's charges.

71.     The speed at which Defendant MDJs conduct each preliminary arraignment effectively precludes the arrested person from assessing what essential bail information the MDJ lacks and presenting that information—let alone deciding whether and how they should present that information rather than remain silent.

72.     For example, one individual stated that her preliminary arraignment in front of MDJ Tobin "was so quick, [she] didn't even know what happened."

73.     Additionally, the coercive impact of the correctional setting coupled with a lack of understanding of the proceedings prompts many arrested persons to respond only to the limited specific questions posed by Defendant MDJs and not offer unsolicited information.

74.     Indeed, S.M. took the cursory nature of his preliminary arraignment—which lasted approximately one minute—to mean that he was not supposed to say anything to the MDJ.

75.     Many arrested people also fear upsetting the MDJ and thus risking the imposition of even more draconian release conditions.

76.     For example, C.B. worried that he would get in trouble if he spoke at his preliminary arraignment after MDJ Tobin ignored C.B.'s statement that he could not afford a $300,000 monetary bail.

77.     Accordingly, the only way for Defendant MDJs to learn the required information about the arrested person is by asking them.

78.     Yet, during the narrow window in which arrested people appear before the MDJ at preliminary arraignments, Defendant MDJs ask them few to no questions.

79.     For example, MDJ Tobin simply read C.B.'s name, listed his charges, and then set bail, without asking C.B. any questions and imposed $ 300,000 monetary bail that C.B. cannot afford.

80.     Upon information and belief, information about individuals' financial circumstances, family relationships, community ties, health conditions, and addiction history is not otherwise collected from arrested people or made available to Defendant MDJs through other means before they decide to impose cash bail.

81.     And Defendant MDJs sometimes even instruct individuals appearing before them who attempt to speak not to say anything during the preliminary arraignment.

82.     For example, MDJ LeFever silenced G.H. when G.H. attempted to explain why he had a Virginia driver's license, a fact that LeFever stated was the basis for his decision to set monetary bail.

83.     Defendant MDJs' failure to ask arrested people for necessary information or to inform them of what information is relevant to bail determinations is a denial of procedural due process.

### *Failure to Give Notice of Adverse Facts*

84.     When ordering cash bail, Defendant MDJs consistently fail to explain why imposing a monetary condition or the amount was necessary.

85.     Defendant MDJs thus fail to give arrested people notice of what information the MDJ actually considered in setting cash bail.

86.     Without this notice, arrested people cannot respond to the information that is being used against them, also in violation of procedural due process.

### *Failure to Consider Essential Information*

87.     Finally, because MDJs fail to ask arrested people for the necessary information or give arrested people the ability to present that information themselves, Defendant MDJs in fact do not consider the information or make the individualized findings as to a defendant's danger to the community, flight risk, and ability to pay required by state and federal law before imposing cash bail.

88.     For example, MDJ Chudzik set $150,000 in straight monetary bail for one currently incarcerated individual who is unemployed and has no savings, without asking him any questions about his financial circumstances or his ties to the community.

89.     When the individual asked why the bail had been set so high, MDJ Chudzik replied "I'm done with him" and ended the preliminary arraignment.

90.     Defendant MDJs' failure to conduct these inquiries prevents them from properly conducting the required individualized assessment of a person's overall risk to the community and of failing to appear or the necessity of a particular bail amount.

91.     Upon information and belief, Defendant MDJs also do not consider, let alone make findings about, whether alternative conditions could meet their concerns about a failure to appear or a risk to the safety of the community.

92.     For individuals entitled to release on bail, Defendant MDJs have other, less restrictive options for ensuring that these people appear for subsequent court proceedings, including Release on Recognizance, Release on Nonmonetary Conditions, or Release on Unsecured Bail Bond.  *See* Pa. R. Crim. P. 524(C).

93.     The failure to consider necessary information, including, among other things, alleged danger to the community, the risk of flight, ability to pay, and whether lesser restrictive alternatives than the deprivation of pretrial liberty will satisfy the state's interests, denies arrested people procedural due process and often results in the imposition of de facto detention orders via cash bail that indigent arrested people cannot pay.

**ii.      Defendants Do Not Provide Counsel to Indigent Defendants at Preliminary Arraignments.**

94.     Defendant MDJs' failure to elicit information that they are required to consider before setting bail is also exacerbated by the lack of counsel.

95.     Lancaster County does not provide counsel for arrested people at preliminary arraignments.

96.     Instead, Lancaster County's practice is to appoint counsel for indigent arrested people sometime after the preliminary arraignment but before the preliminary hearing.

97.     Because Lancaster County does not appoint counsel for preliminary arraignments, arrested people who are indigent and would rely on appointed counsel for representation at later stages in the case have no access to counsel when bail is determined, further diminishing their ability to advocate for themselves or challenge cash bail determinations once they are set.

98.     As explained above, arrested people do not receive any explanation of what evidence could be legally relevant to the bail determination, often do not know whether or when they should speak, and may fear that self-advocacy could damage their chances of being released with bail, increase the amount of bail imposed, or cause them to inculpate themselves.

99.     Indeed, the coercive nature of the setting, the lack of counsel, and the fact that people do not understand what information an MDJ relies on to make a bail determination, often cause people to make self-incriminating statements.

100.    Legal counsel would help to ensure that necessary information is presented to an MDJ during the preliminary arraignment without the risk that individuals will make inculpatory statements.

101.    Counsel could also help ensure the accuracy of the little information that the MDJ already possesses at the preliminary arraignment.

102.    Even if arrested people knew the factors relevant to bail determinations, they cannot be expected—consistent with Due Process or the Sixth Amendment—to answer questions or offer information regarding "mitigating or aggravating factors that may bear upon the likelihood of conviction and possible penalty," Pa. R. Crim. P. 523(A)(1), while sitting in state custody, without counsel.

103.    Counsel's knowledge of constitutional law and Pennsylvania criminal law and procedure is necessary to present evidence and make competent arguments in favor of release.

104.    Counsel's knowledge of local criminal-court procedures is necessary to make competent arguments about alternative conditions of release that could meet the states' interest in mitigating flight risk or danger.

105.    Counsel is necessary to observe the proceedings at the preliminary arraignment and reconstruct them later, if necessary to challenge the bail determination.

106.    Preliminary arraignments are not transcribed or recorded, and MDJs do not make any findings on the record supporting their bail determinations.

107.    Counsel is necessary to serve as a capable representative in a confusing and high-stakes proceeding.

108.    Arrestees are understandably worried that there is too much at stake to speak up and potentially harm their chances of release.

109.    The lack of legal counsel at this critical stage of the proceedings thus seriously harms arrested people.

### C.    Defendant MDJs Regularly Impose Cash Bail that Functions as De Facto Detention Orders.

110.    The result of these inadequate procedures is the arbitrary imposition of cash bail by Defendant MDJs at monetary amounts that bear no relationship to the law, the individual arrestee, or any of the permissible bases for depriving a person of their fundamental right to pretrial liberty.

111.    Defendant MDJs regularly set monetary bail for indigent criminal defendants at preliminary arraignments at amounts that they cannot afford to pay.

112.    For example, MDJ Bixler imposed a $2,000,000 monetary bail on D.B., without asking D.B. any questions about his financial circumstances.

113.     Similarly, MDJ LeFever imposed a $500,000 monetary bail on a man who was on food stamps and medical assistance, forcing the man to remain confined in LCP for a month until another MDJ lowered his bail to $40,000, which the man could only post using the services of a bail bondsman.

114.     Imposing unaffordable cash bail inevitably causes people who cannot pay, including Plaintiffs, to be held in prison pending trial, while wealthier defendants can buy their release.

115.     Upon information and belief, Defendant MDJs have, at most, information about only the arrested person's criminal charges in almost all cases.

116.     Upon information and belief, a large portion of those arrested people against whom Defendant MDJs impose cash bail cannot afford the amount set.

**D.     Defendants Frequently Limit and Delay Arrested People's Abilities to Challenge Their Unaffordable Cash Bail Decisions.**

117.     Defendants' deficient preliminary-arraignment procedures are not cured by the availability of theoretically *de novo* review at a preliminary hearing.

118.     Pennsylvania law does not require that the preliminary hearing be scheduled until "14 days after the preliminary arraignment if the defendant is in custody."  Pa. R. Crim. P. 540(G)(1).

119.     The preliminary hearing cannot erase the days, weeks, or months that the arrested person was imprisoned—without anything resembling an adequate pre-or-post-deprivation hearing, let alone being convicted of a crime—on an unaffordable cash bail amount that was tantamount to a de facto detainer order.

120.     During this time, detained persons are deprived of their constitutionally protected right to liberty.

121.    Additionally, bail determinations at preliminary hearings often utilize the same cursory, truncated procedures used in preliminary arraignments, including failing to provide arrested persons adequate opportunities to be heard about essential information.

122.    Defendant MDJs do not permit incarcerated people to appear in person for their preliminary hearing—unlike accused people who enjoy their pretrial liberty and attend hearings in person, incarcerated people may only attend via video.

123.    Incarcerated people have no opportunity to speak confidentially with an attorney and must watch their preliminary hearing via a screen while accompanied by a correctional officer.[3]

124.    Counsel is appointed to all detained persons at LCP, except those who retain private counsel, after the preliminary arraignment but before the preliminary hearing.

125.    Because counsel are not appointed until after the preliminary arraignment and there is no record of the MDJs' reasons for assigning cash bail, counsel often lacks any information relevant to the bail determination and thus cannot present that information to the court at the preliminary hearing.

126.    Detained persons who have counsel appointed to them do not meet with their attorney until minutes before the preliminary hearing, almost always by video.

127.    Although preliminary hearings are supposed to be *de novo*, in practice substantial deference is given to MDJs' cursory initial bail determinations.

---

[3] This practice appears to violate Pennsylvania Rule of Criminal Procedure 119, which prohibits courts from using two-way simultaneous audio-visual communication at preliminary hearings.

128.    Similarly, counsel often has tremendous difficulty seeking bail modifications because of MDJs' failures to explain the reasons for their decisions and the lack of any record of the preliminary arraignment.

129.    In short, because preliminary arraignments are generally closed to the public, not recorded or transcribed, and not attended by counsel, challenging the initial bail determination is extremely challenging for indigent arrested people such as Plaintiffs at a preliminary hearing (or otherwise).

130.    Finally, detained persons' lack of understanding of preliminary hearing process and the brevity of their meetings with counsel also leads some detained persons to feel pressured or coerced to agree to continue their preliminary hearings or waive the preliminary hearing altogether.

131.    Such continuances and waivers result in continued incarceration unless and until counsel files a motion to modify the bail amount, which is often unsuccessful.

**E.    Pretrial Detention Causes Great Harm to Indigent Defendants.**

*Financial, Personal, and Litigation Harms*

132.    In addition to depriving arrested people of their freedom, pretrial detention wreaks havoc on people's lives.

133.    Pretrial detention of even just a few days has "serious deleterious effects . . . on outcomes such as job loss, residential instability, negative financial impacts and loss of social support." Alexander Holsinger, *Analyzing Bond Supervision Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, Crime & Justice Inst. (June 2016), http://www.crj.org/assets/2017/07/13_bond_supervision_report_R3.pdf.

134.    Being incarcerated on pending criminal charges separates parents and caregivers from their children and families.

135.    For example, A.D. missed the birth of his child while detained and was forced to listen to his girlfriend give birth over a prison phone.  And a woman who was previously detained pretrial on unaffordable monetary bail was not able to speak with her four children for nearly two months while she was confined at LCP.

136.    People confined pretrial on cash bail also have their education disrupted.

137.    For example, C.B. will be forced to miss his high school graduation and repeat his senior year of high school after he missed over a month of school as the result of being detained on unaffordable monetary bail.

138.    Pretrial detention causes people to miss work, leading to lost wages and, frequently, lost jobs.

139.    For example, H.C. lost his part-time jobs due to his pretrial detention. He relied on his employment income to pay his rent.

140.    Unable to pay rent, incarcerated people face eviction from their homes.

141.    For example, H.C. risks losing the apartment he has lived in for the past 13 years, and all his possessions within the apartment, if he remains held on monetary bail.

142.    All of this occurs this while detained persons incur fees from the prison and its service providers for processing, doctor's visits, using the law library copier, and for loved ones to deposit money into their prison accounts.  Lancaster County Prison, *Inmate Handbook* 10, 12, 14 (2019a), *available at* https://www.co.lancaster.pa.us/DocumentCenter/View/6901/Inmate-Rulebook-?bidId=

143.    Indigent accused persons detained pretrial who cannot afford to pay for phone calls are left isolated from loved ones.

144.    For example, S.M. hasn't been able to speak on the phone with family or friends for over three weeks.

145.    For those with physical or mental health concerns, pretrial incarceration carries additional dangers.

146.    For example, being detained in LCP has exacerbated H.C.'s diabetes and LCP has failed to properly manage H.C.'s insulin, leading him to have multiple low blood sugar episodes.

147.    H.C. worries that he could die from such an episode while detained.

148.    While incarcerated, arrested people often cannot access their healthcare providers and can lose access to, or face delays in receiving, medications, leading to serious health consequences.

149.    Incarceration also interrupts the routine and stability that can be crucial in managing a disability or illness.

150.    Given the harm caused by admission to jail, suicide is the leading cause of death in local jails.[4]

151.    In February 2022, 96 out of the 751 people detained at LCP were on suicide watch. Lancaster County Prison Board Report, Mar. 17, 2022 (last visited Mar. 18, 2022) at 15, https://www.co.lancaster.pa.us/DocumentCenter/View/13745/3-17-22-Prison-Board-Report.

---

[4] Margaret E. Noonan, U.S. Dep't of Justice, Bureau of Justice Statistics, *Mortality in Local Jails and State Prisons, 2000–2013 – Statistical Tables* 1, 20 (Aug. 2015), https://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf *See also* Margaret E. Noonan, U.S. Dep't of Justice, Bureau of Justice Statistics, *Mortality in Local Jails, 2000–2014 – Statistical Tables 2* (Dec. 2016), https://www.bjs.gov/content/pub/pdf/mlj0014st.pdf (finding that nationwide, three-quarters of jail deaths occur among people in pretrial detention, and more than one-third occurred within the first seven days of incarceration); Maurice Chammah & Tom Meagher, *Why Jails Have More Suicides Than Prisons*, Marshall Project (Aug. 4, 2015), https://www.themarshallproject.org/2015/08/04/why-jails-have-more-suicides-than-prisons (suggesting that the higher suicide rate in local jails may be due to the "shock of confinement" and jails having less information to go off of in assessing suicide risk)

152.     Individuals entering the LCP with drug and alcohol addiction issues often lack access to adequate treatment.

153.     Over the eight-month period ending February 2022, an average of more than 100 people incarcerated in LCP required detox services each month. *Id.* at 13.

154.     Moreover, pretrial detention can also have a significant impact on arrested persons' abilities to litigate the charges against them.

155.     Pretrial detention hinders arrested people's "ability to gather evidence, contact witnesses, or otherwise prepare [their] defense." *Barker v. Wingo*, 407 U.S. 514, 533 (1972).

156.     When detained people eventually get counsel, being incarcerated also makes it harder for them to meet with their attorneys to discuss their cases.

157.     One man reported that his first opportunity to speak with his public defender was over video immediately before his preliminary hearing.

158.     The conversation lasted only a couple of minutes and was conducted in an open area with correctional officers nearby,

159.     His first chance to speak confidentially with his attorney, in-person, did not occur until more than a month after he was arrested.

160.     Although it is already difficult for people to gather evidence and prepare their defenses while detained pretrial, it is nearly impossible to do so without an attorney's help.

161.     In addition to advising people facing charges about what evidence will be relevant and what defenses are most likely to succeed, counsel is often indispensable in interviewing witnesses and gathering evidence that the incarcerated person cannot physically access from inside a prison cell.

*Harm to Litigation Outcomes*

162.    All these hardships occur before people have been convicted of any crime.

163.    But in part because of these hardships, people detained pretrial face worse outcomes at trial, during plea negotiations, and sentencing than those released pretrial, even when charged with the same offenses.

164.    On average, individuals incarcerated pretrial are 13% more likely to be found guilty, 25% more likely to plead guilty, four times more likely to be sentenced to jail time, and they receive jail sentences that are nearly three times longer than those free while waiting for their trials.[5]

165.    Moreover, the personal, financial, and litigation hardships caused by pretrial detention decrease arrested people's plea-bargaining power and often induce them to plead guilty in exchange for a time-served sentence, even if they are innocent or would have otherwise sought a trial.[6]

---

[5] See Christopher Lowenkamp et al., *Investigating The Impact Of Pretrial Detention On Sentencing Outcomes*, Laura & John Arnold Foundation 12, 14 (2013), https://university.pretrial.org/viewdocument/investigating-the-im (finding that "defendants detained for the entire pretrial period were 4.44 times more likely to be sentenced to jail" than those released pretrial, and that defendants detained pretrial faced 2.78 times longer jail sentences); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. Econ. & Org. 18 (2018), https://www.econ.pitt.edu/sites/default/files/Stevenson.jmp2016.pdf (finding that individuals jailed pretrial are 13 percent more likely to be convicted); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 747 (2017), *available at* https://review.law.stanford.edu/wp-content/uploads/sites/3/2017/02/69-Stan-L-Rev-711.pdf (finding that "detainees plead[ guilty] at a 25% . . . higher rate than similarly situated releasees.").

[6] Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Legal Stud. 471, 473 (2016) ("Many Respondents who are detained on money bail before trial may consequently choose to plead guilty to avoid or minimize further detention. Prosecutors commonly offer detained Respondents a plea of 'time-served,' where Respondents will receive credit for time already spent in detention and will therefore be released immediately upon conviction.").

166.    One individual held on unaffordable monetary bail reported that he wanted to contest the charges against him, but being detained on monetary bail made him feel pressure to take a plea deal so that he could get out of LCP.

*Continuances and Waivers Exacerbate These Hardships*

167.    Because detained people do not get a chance to seek a bail reduction until their preliminary hearing, they are subjected to these hardships for days or weeks, at a minimum.

168.    Yet, continuances and waivers of the preliminary hearing (because detained person often feel that they must continue or waive their preliminary hearing) extend and exacerbate these hardships for weeks or months on end.

169.    By extending the arrestee's detention, continuances of the preliminary hearing prolong the resulting separation from family, loss of income, and denial of medical services.

170.    And the pressure to plead guilty just to get out of jail is exacerbated by the prospect of continuances prolonging the detention (and the resulting hardships) for a seemingly indefinite amount of time.

**F.      Plaintiffs Are Being Held in Jail Solely Because They Cannot Afford to Pay for their Release.**

171.    **Plaintiff H.C.** was arrested on March 19, 2022, for robbery, conspiracy, harassment, and driving with a suspended license.  H.C. was taken to LCP.

172.    On March 20, 2022, H.C., accompanied by a correctional officer, appeared before MDJ Chudzik via video, for his preliminary arraignment.

173.    H.C. was not represented by counsel for his preliminary arraignment.

174.    H.C. cannot afford private counsel.

175.    MDJ Chudzik did not ask H.C. whether he wanted to be appointed counsel for his preliminary arraignment.

176.    H.C.'s preliminary arraignment lasted approximately two minutes.

177.    MDJ Chudzik did not provide notice to H.C. of the purpose of the preliminary arraignment.

178.    H.C. was warned by the correctional officer not to say anything at the preliminary arraignment.

179.    MDJ Chudzik did not ask H.C. any questions during the preliminary arraignment and did not provide H.C. an opportunity to speak.

180.    Upon information and belief, MDJ Chudzik did not have any information during the preliminary arraignment related to H.C.'s financial circumstances; employment status and history; nature of his family relationships; length and nature of his residence in the community; his character, reputation, mental condition; or whether he suffered from an alcohol or drug disorder.

181.    H.C. is indigent and receives food stamps and housing assistance.

182.    At the time of his preliminary arraignment, H.C. held two part-time jobs:  He worked for a company that builds storage sheds and as a driver for an Amish person.

183.    H.C. has a sixteen-year-old daughter whom he saw every week prior to his incarceration.

184.    MDJ Chudzik did not ask H.C. questions or give him an opportunity to speak about whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

185.    MDJ Chudzik assigned H.C. $100,000 in straight cash bail, meaning that H.C. must pay the full $100,000 to be released pretrial, rather than 10%.

186.    MDJ Chudzik stated that the bail amount was based on "the severity of the crime."

187.    MDJ Chudzik did not make any individualized findings as to whether cash bail was necessary to ensure that H.C. would appear at subsequent court proceedings or whether he had the financial means to pay the bail assigned.

188.    MDJ Chudzik did not ask H.C. whether he could afford to pay the bail.

189.    H.C. cannot afford to pay $100,000.

190.    As a result of being assigned an unaffordable cash bail, H.C. has been incarcerated in the Lancaster County Prison since March 19, 2022.

191.    H.C. is represented by the Lancaster County Public Defender.

192.    H.C.'s preliminary hearing was initially scheduled for almost two weeks after he had been arrested.

193.    Several minutes before the preliminary hearing, H.C. had the opportunity to meet with counsel for the first time, by video, while surrounded by correctional officers.

194.    He was told that the hearing was continued to April 5 because the complaining witness did not show up.

195.    On April 5, just minutes before that hearing, new counsel met with H.C., again by video, but when H.C. attempted to inform the attorney about the facts of his case, his attorney told him there was not enough time to discuss the details of the case.

196.    Instead, counsel simply asked him if he would waive the hearing, which H.C. refused to do.

197.    MDJ Mary Mongiovi Sponaugle reduced H.C.'s bail to $50,000 (straight) at the preliminary hearing after the complaining witness testified that her cell phone and cigarettes had been returned to her.

198.   Upon information and belief, MDJ Sponaugle did not consider H.C.'s financial circumstances in assigning him $50,000 in straight bail.

199.   H.C. cannot afford to pay $50,000 to obtain his pretrial release.

200.   Due to his incarceration, H.C. lost his job with the shed company and is worried that he will lose his other job as a driver.

201.   H.C. has not seen his minor daughter since he was incarcerated.

202.   H.C. fears that he will lose his rental assistance due to his incarceration and be evicted from the home where he has lived for 13 years, causing him to lose all his possessions.

203.   H.C. suffers from diabetes, which he has been unable to manage adequately while incarcerated.

204.   He has been treated by LCP medical staff several times after fainting due to low blood sugar.

205.   H.C. is scared that he will die from a diabetic coma and leave his  daughter fatherless.

206.   **Plaintiff R.H.** was arrested on March 20, 2022, for possession of a firearm and possession of a controlled substance, and taken to the LCP.

207.   That day, R.H. appeared before MDJ Chudzik for his preliminary arraignment.

208.   R.H. was not represented by counsel for his preliminary arraignment.

209.   R.H. cannot afford private counsel.

210.   MDJ Chudzik did not ask R.H. whether he wanted to be appointed counsel for his preliminary arraignment.

211.   R.H.'s preliminary arraignment was held via video while R.H. was in the LCP.

212.   R.H. had a difficult time hearing MDJ Chudzik over the video.

213.    R.H.'s preliminary arraignment lasted approximately 3 minutes.

214.    MDJ Chudzik did not provide notice to R.H. of the purpose of the preliminary arraignment.

215.    MDJ Chudzik did not ask R.H. any questions or give him an opportunity to speak about his financial circumstances; his employment status and history; the nature of his family relationships; whether he posed a danger to the community; or the feasibility of alternative conditions of release.

216.    The only question MDJ Chudzik asked R.H. was how long he had been a resident of Lancaster.

217.    R.H. responded that he had lived in Lancaster for 21 years.

218.    Upon information and belief, MDJ Chudzik did not have any information related to R.H.'s financial circumstances; his employment status and history; the nature of his family relationships; or other information relevant to whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

219.    Nor did he have any information about R.H.'s character, reputation, mental condition, or whether R.H. suffered from an alcohol or drug disorder.

220.    MDJ Chudzik assigned R.H. $50,000 in cash bail at 10%, meaning he must pay $5,000 to be released from the LCP pending trial.

221.    MDJ Chudzik did not make any individualized findings as to whether cash bail was necessary to ensure that R.H. would appears at subsequent court proceedings or whether R.H. posed a danger to anyone or had the financial means to pay the bail assigned.

222.    R.H. told MDJ Chudzik that he could not afford to pay $5,000.

223.    When R.H. tried to explain the circumstances of his arrest in an effort to have his bail reduced, MDJ Chudzik told him to speak to an attorney.

224.    As a result of being assigned an unaffordable cash bail, R.H. has been incarcerated in the Lancaster County Prison since March 20, 2022.

225.    R.H. is represented by the Lancaster County Public Defender.

226.    R.H.'s preliminary hearing occurred on March 30, 2022, before MDJ LeFever via video while R.H. was in the LCP.

227.    R.H. had difficulty hearing during the preliminary hearing and was only able to hear about half of what was said.  When R.H. tried to talk during the preliminary hearing, MDJ LeFever told him, "You can't speak right now."

228.    MDJ LeFever did not lower the bail assigned to R.H.

229.    R.H. is unemployed and receives $860 per month in SSI, as well as food stamps, and Medicaid. His rent and living expenses are approximately $900 per month.

230.    R.H. reasonably fears that he will lose his home of thirteen years and all his possessions if he is not released soon.

231.    He also reasonably fears that his government benefits will be terminated while he is incarcerated.

232.    R.H. suffers from arthritis, a painful condition that has been exacerbated as a result of being in the LCP.

233.    **Plaintiff C.B.** was arrested on January 11, 2022, for possession of a firearm without a license, robbery, conspiracy, simple assault, and disorderly conduct, and was taken to the Lancaster County Prison.

234.    On January 12, 2022, C.B. appeared before MDJ Tobin for his preliminary arraignment, which took place via video at the LCP, while C.B. was accompanied by a correctional officer.

235.    C.B. was not represented by counsel for his preliminary arraignment.

236.    MDJ Tobin did not ask C.B. whether he wanted to be appointed counsel for his preliminary arraignment.

237.    C.B.'s preliminary arraignment lasted approximately one minute.

238.    MDJ Tobin read C.B.'s name, listed the charges against him, and set bail at $300,000.

239.    MDJ Tobin did not provide notice to C.B. of the purpose of the preliminary arraignment.

240.    MDJ Tobin did not allow C.B. to ask any questions or give him an opportunity to speak.

241.    MDJ Tobin did not ask C.B. any questions about his financial circumstances.

242.    At the time of his arrest, C.B. was a senior in high school living with his mother and sister.

243.    He worked two part-time jobs after school and on the weekend.

244.    MDJ Tobin did not ask C.B. any questions about his employment status and history; the nature of his family relationships; or the length and nature of his residence in the community.

245.    Upon information and belief, MDJ Tobin did not have any information related to C.B.'s employment status and history; the nature of his family relationships; or the length and nature of his residence in the community.

246.    Nor did he have an information related to C.B.'s character, reputation, mental condition, or whether C.B. suffered from an alcohol or drug disorder.

247.    When MDJ Tobin announced that C.B.'s bail would be set at $300,000, C.B. told him that he did not have that type of money.

248.    C.B. did not say anything further for fear he would get in trouble.

249.    MDJ Tobin did not make any individualized findings as to whether cash bail was necessary to ensure that C.B. would appear at subsequent court proceedings or whether C.B. posed a danger to anyone or had the financial means to pay the bail assigned.

250.    C.B. would be able to obtain his release from pretrial incarceration for 10% of the bail set, or $30,000

251.    C.B. does not have $30,000.

252.    As a result of being assigned an unaffordable cash bail, C.B. has been incarcerated in the Lancaster County Prison since January 11, 2022

253.    C.B.'s preliminary hearing was scheduled for February 4, 2022.

254.    The firearm possession and disorderly conduct charges were waived for court.

255.    The Commonwealth withdrew the other charges against him.

256.    C.B.'s bail was reduced to $250,000 at 10%, which he still cannot afford to pay.

257.    Although C.B. is eligible for a court-appointed counsel or public defender due to his indigence, C.B.'s family members hired a lawyer to represent him.

258.    His lawyer filed a motion for a bail modification on April 14, which was denied.

259.    Due to his incarceration, C.B. lost both of his part-time jobs, which provided income he used to help support his mother and sister.

260.    Because he missed more than a month of school, C.B. will not be eligible to graduate this spring and will have to obtain his GED or repeat his senior year of high school.

261.    **Plaintiff A.D.** was charged with robbery, a felony of third degree, and conspiracy. He turned himself in on March 29, 2022.

262.    On March 29, 2022, A.D. appeared before MDJ Bixler for his preliminary arraignment.

263.    A.D. was not represented by counsel for his preliminary arraignment.

264.    MDJ Bixler did not ask A.D. whether he wanted to be appointed counsel for his preliminary arraignment.

265.    A.D.'s preliminary arraignment was held via video from the LCP.

266.    A.D.'s preliminary arraignment lasted about five minutes.

267.    MDJ Bixler did not provide notice to A.D. of the purpose of the preliminary arraignment.

268.    MDJ Bixler read the charges against A.D. and the affidavit of probable cause.

269.    MDJ Bixler asked A.D. where he was from and whether he was employed.

270.    A.D. told MDJ Bixler that he had lived in Lancaster his entire life.

271.    MDJ Bixler did not ask A.D. any other questions, or give him an opportunity to speak, about whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

272.    Upon information and belief, MDJ Bixler did not have any information related to A.D.'s financial circumstances; the nature of his family relationships; or other information relevant to whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

273.     Nor did he have any information about A.D.'s character, reputation, mental condition, or whether A.D. suffered from an alcohol or drug disorder.

274.     At the time of his preliminary arraignment, A.D. worked at a hospital to support his pregnant girlfriend.

275.     MDJ Bixler assigned A.D. $15,000 in straight cash bail.

276.     A.D. asked MDJ Bixler to give him ROR, but he refused.

277.     MDJ Bixler did not make any individualized findings as to whether cash bail was necessary to ensure that A.D. would appear at subsequent court proceedings or whether A.D. posed a danger to anyone or had the financial means to pay the bail assigned.

278.     As a result of being assigned an unaffordable cash bail, A.D. has been incarcerated in the Lancaster County Prison since March 29, 2022.

279.     A.D.'s girlfriend gave birth to their child while A.D. was incarcerated.  As a result of his pretrial incarceration, A.D. missed the birth of his child.

280.     Due to his incarceration, A.D. is unable to financially support his girlfriend and new baby.

281.     **Plaintiff S.M.** was arrested on March 29, 2022, for two drug-related charges.

282.     On March 29, 2022. S.M. appeared before Judge Bixler for his preliminary arraignment.

283.     S.M. was not represented by counsel for his preliminary arraignment.

284.     S.M. cannot afford private counsel.

285.     MDJ Bixler did not ask S.M. whether he wanted to be appointed counsel for his preliminary arraignment.

286.     S.M.'s preliminary arraignment took place over video from the LCP.

287.    S.M.'s preliminary arraignment lasted about one minute.

288.    MDJ Bixler did not provide notice to S.M. of the purpose of the preliminary arraignment.

289.    MDJ Bixler did not ask S.M. any questions or give him an opportunity to speak about his financial circumstances; his employment status and history; the nature of his family relationships; whether he posed a danger to the community; or the feasibility of alternative conditions of release.

290.    Upon information and belief, MDJ Bixler did not have any information related to S.M.'s financial circumstances; his employment status and history; the nature of his family relationships; or other information relevant to whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

291.    Nor did he have any information about S.M.'s character, reputation, mental condition, or whether S.M. suffered from an alcohol or drug disorder.

292.    This was S.M.'s first arrest.

293.    MDJ Bixler assigned S.M. $30,000 in straight cash bail.

294.    S.M. did not say anything during the preliminary arraignment because he was unfamiliar with the process and did not know whether he was permitted to speak.

295.    If he had known he could speak, S.M. would have asked MDJ Bixler to assign a lower bail amount that he could afford.

296.    MDJ Bixler did not make any individualized findings as to whether cash bail was necessary to ensure that S.M. would appear at subsequent court proceedings or whether S.M. posed a danger to anyone or had the financial means to pay the bail assigned.

297.    As a result of being assigned an unaffordable cash bail, S.M. has been incarcerated in the Lancaster County Prison since March 29, 2022.

298.    S.M. is represented by the Lancaster County Public Defender's Office.

299.    S.M.'s preliminary hearing, originally scheduled for April 5, has been continued to May 10.

300.    S.M. has been unable to contact any friends or family while he is incarcerated.

301.    S.M. works as an independent contractor and has a job lined up for May but reasonably fears he will lose the job if he is not released from the LCP.

302.    S.M. shares an apartment with roommates and contributes to the rent.

303.    He reasonably fears he will lose his home due to his incarceration because he has no way to pay his share of the rent or even inform his roommates that he is incarcerated.

304.    **Plaintiff D.B.** was arrested on March 29, 2022, on various firearm- and drug-related charges.

305.    On March 29, 2022, D.B. appeared before MDJ Bixler for his preliminary arraignment.

306.    D.B. was not represented by counsel for his preliminary arraignment.

307.    D.B. cannot afford private counsel.

308.    MDJ Bixler did not ask D.B. whether he wanted to be appointed counsel for his preliminary arraignment.

309.    D.B.'s preliminary arraignment was held via video from the LCP.

310.    MDJ Bixler did not provide notice to D.B. of the purpose of the preliminary arraignment.

311.    MDJ Bixler did not ask D.B. any questions or give him an opportunity to speak about his financial circumstances; his employment status and history; the nature of his family relationships; whether he posed a danger to the community; or the feasibility of alternative conditions of release.

312.    Upon information and belief, MDJ Bixler did not have any information about D.B.'s financial circumstances; his employment status and history; the nature of his family relationships; or other information relevant to whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

313.    Nor did he have any information about D.B.'s character, reputation, or mental condition, or whether D.B. suffered from an alcohol or drug disorder.

314.    MDJ Bixler assigned D.B. $2,000,000 in straight cash bail.

315.    D.B. cannot afford to pay $2,000,000.

316.    MDJ Bixler did not make any individualized findings as to whether cash bail was necessary to ensure that D.B. would appear at subsequent court proceedings or whether D.B. posed a danger to anyone or had the financial means to pay the bail assigned.

317.    Rather, MDJ Bixler stated that he was setting D.B.'s bail at $2,000,000 due to the nature of the charges against him.

318.    As a result of being assigned an unaffordable cash bail, D.B. has been incarcerated in the Lancaster County Prison since March 29, 2022.

319.    D.B. is represented by the Lancaster County Public Defender's Office.

320.    D.B.'s preliminary hearing, originally scheduled for April 8, has been continued to May 18.

321.    **Plaintiff G.H.** was arrested on April 16, 2022, for misdemeanor theft for failing to pay a $58 bar tab and public drunkenness, a summary offense.

322.    After arresting G.H., police took him first to the police station and then to Lancaster General Hospital for medical clearance. Lancaster General Hospital held him and provided care for three days.

323.    When G.H. was released from the hospital on April 19, he contacted the police to find out how to turn himself in.

324.    G.H. was told to go to the police station, which he did, walking on foot from the hospital to the police station.

325.    After arriving at the police station on April 19, G.H. appeared via video before MDJ LeFever for his preliminary arraignment.

326.    G.H. has hearing loss and it was difficult for him to hear the judge on the video.

327.    G.H. was not represented by counsel for his preliminary arraignment.

328.    G.H. cannot afford private counsel.

329.    MDJ LeFever did not ask G.H. whether he wanted to be appointed counsel for his preliminary arraignment.

330.    G.H.'s preliminary arraignment lasted less than five minutes.

331.    MDJ LeFever did not provide notice to G.H. of the purpose of the preliminary arraignment.

332.    MDJ LeFever asked where G.H. resided and why he was in Lancaster.

333.    G.H. told him he was in Lancaster to attend a rehabilitation program at The Retreat in Ephrata, Pennsylvania, where a bed was waiting for him.

334.     MDJ LeFever did not ask G.H. any other questions, or give him an opportunity to speak, about his financial circumstances; the nature of his family relationships; whether he posed a danger to the community; or the feasibility of alternative conditions of release.

335.     Upon information and belief, MDJ LeFever did not have any information about G.H.'s financial circumstances; the nature of his family relationships; or other information relevant to whether he posed a danger to the community or a risk of flight, his ability to pay cash bail, or the feasibility of alternative conditions of release.

336.     Nor did he have any information about G.H.'s character or reputation.

337.     MDJ LeFever assigned G.H. $5,000 in straight cash bail.

338.     MDJ LeFever told G.H. that he was assigning cash bail because G.H. had a Virginia driver's license.

339.     MDJ LeFever refused to allow G.H. to speak at the preliminary arraignment.

340.     G.H. is indigent and cannot afford to pay $5,000 to obtain his release from the LCP.

341.     G.H.'s preliminary arraignment is scheduled for April 29.

342.     G.H. has been struggling with alcoholism for decades and has a bed at a residential alcohol treatment program waiting for him at the time of his incarceration.

343.     As a result of his incarceration, G.H. reasonably fears that he will lose his bed at The Retreat.

344.     G.H. is a stroke survivor and walks with a cane.

345.     G.H. also has epilepsy and has faced delays getting his medication while in the LCP.  On April 23, G.H. had a seizure at night in his cell.

G.     **Defendant MDJs' Practice of Assigning Bail without Considering Ability to Pay or Individual Circumstances Does Not Further Any Valid Judicial or Governmental Goal.**

346.    The Defendant MDJs have no legitimate interest in imposing cash bail on individuals who cannot afford to pay it without first ensuring that all arrested people have a meaningful opportunity to participate in the bail proceeding, that counsel is provided at all critical stages, and that cash bail is appropriate in light of each arrestee's circumstances.

347.    By routinely imposing unaffordable amounts of cash bail, Defendant MDJs have created a two-tiered system of justice, in which a wealthy individual can purchase their freedom immediately, whereas a poor individual arraigned for the same charges and given the same amount of bail will remain incarcerated indefinitely pending trial.

348.    There is no legal or legitimate justification for this two-tier system.

349.    In fact, the Pennsylvania Rules of Criminal Procedure prohibit imposing any condition of release for the purpose of ensuring that a defendant remains incarcerated pending trial. *See* Pa. R. Crim. P. 524(C)(5) & cmt; *see also id.* at 528(A)-(B) (requiring that prior to the imposition of monetary bail conditions, the MDJ must both assess the defendant's financial ability and the reasonableness of the amount).

350.    Moreover, the Pennsylvania Constitution and the Pennsylvania Rules of Criminal Procedure identify dispositive considerations an MDJ must assess before imposing pretrial confinement:  (1) whether the individual is charged with a crime punishable by death or life imprisonment; (2) whether no set of conditions could ensure the safety of the public; and (3) "all available information . . . relevant to the defendant's appearance or nonappearance at subsequent proceedings."  Pa. Const. art. 1, § 14; Pa. R. Crim. P. 523(A).

351.    The Rules similarly provide that the Commonwealth's interest in conditions of release is dependent on the existence and consideration of specific, enumerated factors justifying those conditions.  *See* Pa. R. Crim. P. 523(A).

352.    Yet, as alleged above, Defendant MDJs' bail scheme fails even to inquire into the facts crucial to those factors before deciding to deprive arrested people of their liberty pending trial.

353.    There is no justification for this arbitrary and lawless practice.

354.    Finally, Defendant MDJs do not adequately consider alternative release conditions that have been shown to be equally as effective as monetary bail in assuring appearance in court.

355.    Empirical evidence shows that requiring money bail as a condition of release does not improve defendants' rates of appearance in court.[7]

356.    After New Jersey overhauled its bail system in 2014, the number of defendants for whom cash bail was ordered fell to just a fraction of 1%, yet the rate at which defendants appeared in court remained high—nearly 90% in 2017. New Jersey Judiciary, *2018 Report to the Governor and the Legislature* at 7 (Apr. 2019), https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf?c=dSE.

---

[7] *See, e.g.,* Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEGAL STUDIES 471, 475 (2016) at 5, available at http://www.columbia.edu/~cjh2182/ GuptaHansmanFrenchman.pdf ("[W]e find no evidence that money bail increases the probability of appearance."); Ex. F, Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pre-Trial Justice Institute Report at 11 (October 2013), available at https://pdfs.semanticscholar.org/5444/7711f036e000af0f177e176584b7aa7532f7.pdf; *see also ODonnell v. Harris Cnty*., 882 F.3d 528, 545 (5th Cir. 2018) (upholding the district court's "thorough review of empirical data and studies [finding] that the County had failed to establish any 'link between financial conditions of release and appearance at trial or law-abiding behavior before trial'"); *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1362 (N.D. Ala. 2018) ("[Plaintiff] offered expert testimony and empirical studies to demonstrate that secured money bail is not more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution.").

357.    The District of Columbia prohibits the imposition of financial conditions that people cannot pay, yet between 2015 and 2019, 88% to 91% of defendants released pretrial appeared for their scheduled court dates. *See* United States Commission on Civil Rights, *The Civil Rights Implications of Cash Bail* 157-160 (2022), available at https://www.usccr.gov/files/2022-01/USCCR-Bail-Reform-Report-01-20-22.pdf

358.    Illinois has recently followed suit, becoming the first state to eliminate cash bail completely.  Maria Cramer, *Illinois Becomes First State to Eliminate Cash Bail*, THE NEW YORK TIMES, Feb. 23, 2012, https://www.nytimes.com/2021/02/23/us/illinois-cash-bail-pritzker.html.

359.    Research also shows no positive correlation between the imposition of cash bail and public safety; to the contrary, the assignment of cash bail increases the likelihood of future unlawful behavior.

360.    For example, a large study of cash bail in Pittsburgh and Philadelphia found that "the assessment of money bail is a significant, independent cause of convictions and recidivism" and noted that this appeared to be "driven by the subset of cases in which arrestees are detained because of their inability to post bail."[8]

---

[8] *See* Arpit Gupta, Christopher Hansman, & Ethan Frenchman, T*he Heavy Costs of High Bail: Evidence from Judge Randomization*, 3 (Aug. 5, 2016) (explaining that assigning cash bail led to a six to nine percent increase in recidivism); *see also,* Paul Heaton et. al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 786–87 (2017) (estimating that forgoing bail for individuals assigned a $500 bail would have resulted in 1,600 fewer felonies and 2,400 fewer misdemeanors in the eighteen months following arraignment); Christopher T. Lowenkamp, Marie VanNostrand, Ph.D., Alexander Holsinger, Ph.D., *The Hidden Costs of Pretrial Detention*, LAURA AND JOHN ARNOLD FOUNDATION, November 2013, at 3. http://www.pretrial.org/download/research/The%20Hidden%20Costs%20of%20Pretrial%20Detention%20-%20LJAF%202013.pdf (finding that when low-risk defendants were held for 8-14 days, they were 51% more likely to commit another crime than equivalent defendants held less than 24 hours and when detained for even 2-3 days on bail, low risk defendants were 40% more likely to commit new crimes than equivalent defendants held no more than 24 hours.).

361.    After reforming its use of cash bail, New Jersey found that the rate of alleged new criminal activity for individuals released pretrial without bail "was virtually the same" as the rate under the prior cash bail system.  *See* Grant at 13.

## V.    CLASS ACTION ALLEGATIONS

362.    Plaintiffs seek injunctive and declaratory relief, on behalf of themselves and all others similarly situated, under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

363.    Plaintiffs seek to represent the class composed of

All people currently detained pre-trial who, during their preliminary arraignments, were assigned unaffordable cash bail based on criminal charges not punishable by death or life imprisonment by the Defendant MDJs without being explicitly asked about or informed of all factors that bear on their danger to the community, risk of flight, and/or ability to pay the amount of cash bail assigned, and/or the likelihood that alternative conditions of release would ensure their appearance at future proceedings.

364.    Plaintiffs seek to represent a subclass composed of

All class members, as defined in Paragraph 347 of the Verified Class Action Complaint in this action, who, at the time of their preliminary arraignments, met the qualifications for representation by the Public Defender but were not represented by counsel at their preliminary arraignments.

365.    Each proposed class and subclass satisfies the numerosity, commonality, typicality, and adequacy requirements of Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

### A.    Numerosity—Fed. R. Civ. P. 23(a)(1)

366.    The number of persons who are members of the class described above are so numerous that joinder of all members in one action is impractical.

367.    The information as to the size of the class and the identity of the individuals who are in the class are in the exclusive control of Defendants.

368.    Each year, hundreds of people are subject to pretrial detention because they are assigned cash bail by the Defendant MDJs that they cannot afford to pay.

369.    LCP admitted 3,750 people during 2021.  *See* Lancaster County Prison Board Report, Jan. 20, 2022 (last visited Mar. 18, 2022) at 28, https://www.co.lancaster.pa.us/DocumentCenter/View/13639/1-20-22-Prison-Board-Report

370.    At any time, approximately 70% of LCP's inmate population is being held pre-trial. *Id.*

371.    Joinder is impracticable because the class is both too numerous and too fluid for the Court to feasibly hear their independent claims:  Every day, new class members are detained and existing class members' claims are mooted through modification of their bail orders (that enable them to obtain their release) or disposition of their criminal cases. During 2021, 3,750 people were admitted to LCP, while 3,599 were discharged.  *Id.*

372.    Joinder is also impracticable because many arrested persons do not have the means to afford to pursue claims on their own.

**B.    Commonality—Fed. R. Civ. P. 23(a)(2)**

373.    The relief sought is common to all members of the class and subclasses, and common questions of law and fact exist as to all members of the class and subclasses.

374.    Plaintiffs seek a declaratory judgment that the Defendant MDJs' arraignment practices are unlawful on the grounds that they violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Sixth Amendment right to counsel.

375.    Plaintiffs also seek an injunction prohibiting Defendant Steberger from detaining arrested persons who are assigned cash bail by Defendant MDJs at preliminary arraignments that lack constitutionally required due process protections.

376.    These claims and remedies are common to the entire class and/or subclasses and would apply equally to all class and/or subclass members.

377.    Questions of law or fact are common to the entire class and/or subclasses because the actions of Defendants complained of herein are generally applicable to the entire class and/or subclasses.

378.    These legal and factual questions include but are not limited to:

    a.    Whether Defendant MDJs regularly impose secured cash bail conditions without inquiring into risk of flight or financial ability to pay and without considering alternative, less restrictive conditions of release;

    b.    Whether Defendant MDJs regularly impose unaffordable monetary bail for arrested persons without adequate procedural protections, including notice, an opportunity to be present and contest evidence, appointment of counsel, and reasoned findings based on clear and convincing individualized evidence on the record that there are no less restrictive means of ensuring that the arrested person will appear for subsequent court proceedings and comply with other bail conditions;

    c.    Whether Defendant Lancaster County has a policy, practice, or custom of not providing counsel for indigent arrested persons at preliminary arraignments;

    d.    Whether imposing unaffordable monetary bail without inquiry into an arrested person's financial ability to pay or consideration of other less restrictive conditions of release violates the Equal Protection Clause of the Fourteenth Amendment;

    e.    Whether imposing unaffordable monetary bail for arrested persons without adequate procedural protections violates the Due Process Clause of the Fourteenth Amendment; and

    f.    Whether the failure to provide counsel at preliminary arraignments violates the Sixth Amendment right to counsel.

C.      **Typicality—Fed. R. Civ. P. 23(a)(3)**

379.    Plaintiffs' claims are typical of the members of the class.  Each class member is injured by the same wrongful acts, omissions, polices, and practices of Defendants as described in this Complaint.

380.    Defendants fail to comply with constitutional requirements—Namely, all class members are confined in jail (or will be) because they cannot afford to pay secured cash bail conditions that they had no opportunity to contest because they were denied a hearing at which indigency could be considered.

381.    Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the class members and are based on the same legal theories.

382.    Plaintiffs do not seek to challenge individual bail determinations, but rather to challenge Defendants' preliminary arraignment practices, customs, and policies as part of a systemic and consistent failure to comply with the United States Constitution.

383.    The constitutional deprivations suffered by Plaintiffs, and those of putative class members, arise from the same systemic issues.

D.      **Adequacy, Fed. R. Civ. P. 23(a)(4)**

384.    Plaintiffs will fairly and adequately assert and protect the interests of the class because their interests in the vindication of their legal claims are entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims.

385.    Plaintiffs are members of the class, and their interests do not conflict with other class members.

386.    There are no known conflicts among members of the proposed class.

387.    All of the respective class members have similar interests in vindicating their constitutional right to receive a hearing in which their indigency is properly considered pursuant to constitutional standards and with an attorney present.

388.    Plaintiffs are represented by attorneys from the ACLU of Pennsylvania and Dechert LLP, who possess substantial combined experience in the conduct of complex class actions, including actions raising constitutional violations under 42 U.S.C. § 1983.

389.    Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole and making certification of the class under Rule 23(b)(2) proper.

## VI.    CAUSES OF ACTION

### COUNT I
**Violation of Procedural Due Process:**
**Failure to Provide Adequate Notice and Hearing and Make Necessary Findings Before Depriving Plaintiffs of a Guaranteed Liberty Interest**
**On Behalf of All Plaintiffs Against MDJ Defendants and Defendant Steberger**

390.    Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

391.    Plaintiffs have a fundamental interest in their pretrial liberty under both the United States and Pennsylvania Constitutions.

392.    Plaintiffs are entitled to due process, including notice and an opportunity to be heard, before being deprived of their pretrial liberty.

393.    Defendant MDJs fail to provide Plaintiffs with meaningful notice or opportunity to be heard before imposing unaffordable cash bail at preliminary arraignments.

394.    Defendants fail to provide advance notice of the rights at stake, appointment of counsel, an effective opportunity to present or contest evidence, or a written record of reasoned

findings that secured bail in the amount set is the least restrictive means of achieving a valid, important, or compelling governmental interest.

395.    Defendant MDJs do not make any meaningful individualized findings at preliminary arraignments that the arrested person, including Plaintiffs, is a danger to the community, unlikely to appear at subsequent court proceedings, or is likely fail to comply with the bail conditions unless the particular amount monetary bail chosen is assigned.

396.    Nor do Defendant MDJs assess an individual's ability to pay before assigning monetary bail.

397.    Defendant MDJs do not usually give notice of the facts actually considered in making bail determinations at preliminary arraignments.

398.    The procedures that Defendant MDJs follow at preliminary arraignments in assigning monetary bail are insufficient to protect against the erroneous deprivation of liberty or the state-law interest in reasonable bail, and thus violate Plaintiffs' Fourteenth Amendment right to procedural due process.

399.    Defendant Steberger executes the MDJs' orders, causing Plaintiffs and other arrested people to be detained in violation of their right to Procedural Due Process under the Fourteenth Amendment to the United States Constitution.

## COUNT II
### Violation of Substantive Due Process:
### Unjustified Pretrial Detention
### On Behalf of All Plaintiffs Against MDJ Defendants and Defendant Steberger

400.    Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

401.    People possess a fundamental liberty interest in freedom from unjustified pretrial detention.

402.   Defendant MDJs routinely impose unaffordable cash bail during uncounseled, cursory preliminary arraignments that functionally deprive Plaintiffs of their pretrial liberty with no effective opportunity to introduce evidence or address proper bail conditions.

403.   These unaffordable bail amounts function as *de facto* pretrial detention orders.

404.   Defendant MDJs set this unaffordable cash bail with virtually no information about the arrested person's danger to the community, risk of flight, or ability to pay, or the availability of alternative conditions of release.

405.   Defendant MDJs set this unaffordable bail in amounts that bear no relation to the law or the individual Plaintiffs.

406.   Defendant MDJs set these unaffordable bail amounts without any formal determination—let alone an individualized determination—that the arrested person is unlikely to appear at subsequent court proceedings, pose a danger to anyone, or is not likely to comply with the bail conditions unless the particular amount of monetary bail chosen is assigned.

407.   The Defendant MDJs routinely fail to justify the pretrial deprivation of liberty and reasonable bail of individuals who are arrested and assigned unaffordable cash bail, in violation of the right to substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution.

408.   Defendant Steberger executes the MDJs' orders, causing Plaintiffs and other individuals who have been arrested and assigned unaffordable money bail to be detained in violation of their right to substantive due process under the Fourteenth Amendment to the United States Constitution.

## COUNT III
### Violation of Sixth and Fourteenth Amendment Right to Counsel:
### Failure to Provide Counsel at a Critical Stage
### On Behalf of All Plaintiffs Against Defendant MDJs and Defendant Lancaster County

409.   Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

410.   Defendant Lancaster County has a policy, custom, or practice of failing to provide arrested persons with counsel at their preliminary arraignments.

411.   Defendant MDJs routinely set unaffordable bail at preliminary arraignments without defense counsel present, causing Plaintiffs to be detained in jail because Plaintiffs are unable to pay their bail.

412.   This initial detention cannot feasibly be challenged by an indigent person with the assistance of counsel until the assignment of counsel and the opportunity to appear before a bail authority, typically the preliminary hearing.

413.   The myriad problems with preliminary hearings, including the time an individual is detained while awaiting their preliminary hearing and the failure to provide in-person hearings for incarcerated people make them an inadequate substitute for a counseled preliminary arraignment.

414.   The Sixth Amendment to the United States Constitution, incorporated against the States by the Fourteenth Amendment, guarantees criminal defendants the right to counsel at each critical stage of the criminal process.

415.   Critical stages include all pretrial hearings that may prejudice the fairness of subsequent criminal proceedings, including the fairness of plea bargaining.

416.    Bail setting at both the preliminary arraignment and preliminary hearing in Lancaster County is a critical stage of prosecution, and the Sixth Amendment requires that arrested persons have the benefit of counsel when bail is set.

417.    By setting cash bail at the preliminary arraignment without timely appointing defense counsel to represent and assist them, the Defendant MDJs violate the right to counsel guaranteed by the Sixth Amendment to the United States Constitution.

418.    Defendant Lancaster County violated Plaintiffs' right to counsel guaranteed by the Sixth Amendment to the United States Constitution by failing to provide counsel at this critical stage of prosecution.

### COUNT IV
**Violation of Equal Protection:**
**Wealth-Based Discriminatory Detention**
**On Behalf of All Plaintiffs Against Defendant MDJs and Defendant Steberger**

419.    Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

420.    Defendant MDJs routinely set unaffordable cash bail amounts without sufficient, if any, individualized inquiry or findings concerning the arrestee's ability to pay or whether other less restrictive, non-financial conditions suffice to meet the state's interests in preventing flight and reasonably assuring public safety.

421.    Defendant MDJs and Steberger's practices cause Plaintiffs and putative class members to be incarcerated because they are unable to pay secured cash bail conditions while similarly situated people with means to pay are released.

422.     Defendant MDJs and Steberger's practices of detaining Plaintiffs and other individuals solely on the basis of their inability to pay bail violate Plaintiffs' and putative class members' rights to Equal Protection under the Fourteenth Amendment to the United States Constitution.

423.     Defendant Steberger executes Defendant MDJs' orders, causing Plaintiffs and other individuals who have been arrested and assigned unaffordable money bail to be detained in violation of their rights to Equal Protection under the Fourteenth Amendment to the United States Constitution.

## VII.          PRAYER FOR RELIEF

Plaintiffs and the class they seek to represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class they seek to represent have suffered and will continue to suffer irreparable harm as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless this Court grants the relief requested.  The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.   Certify this lawsuit  as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

b.   Declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, and officials have violated and continue to violate Plaintiffs' rights under the Sixth and Fourteenth Amendments to the United States Constitution;

c.  Enjoin, preliminarily and permanently thereafter, Defendant Steberger and her employees and agents from executing orders by the Defendant MDJs to detain individuals on cash bail unless the MDJs comply with the requirements of the Sixth and Fourteenth Amendments and engage in a constitutionally adequate inquiry into all factors essential to a lawful bail determination, including ability to pay;

d.  Issue an injunction, preliminarily and permanently thereafter, requiring Defendant Lancaster County to provide counsel to indigent arrested persons within a reasonable time to allow adequate representation at preliminary arraignments.

e.  Grant reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

f.  Grant such other relief as the Court deems just and proper.

Respectfully Submitted,


<u>/s/ Richard Ting</u>
Richard Ting
PA No. 200438
Sara J. Rose
PA. No. 204936
**AMERICAN CIVIL LIBERTIES UNION**
  **OF PENNSYLVANIA**
P.O. Box 23058
Pittsburgh, PA 15222
Tel.: (412) 681-7736 x328
rting@aclupa.org
srose@aclupa.org


Nyssa Taylor
PA No. 200885
Ariel Shapell*
PA. No. 330409
*Pending admission pro hac vice*
**AMERICAN CIVIL LIBERTIES UNION**
  **OF PENNSYLVANIA**
P.O. Box 60173
Philadelphia, PA 19102
Tel.: (215) 592-1513
ntaylor@aclupa.org
ashapell@aclupa.org

I, _____, have reviewed a copy of the complaint. I declare

under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I

have personal knowledge of the facts and statements contained within this complaint, and that

these facts and statements are true and correct.


Signed on the 25th day of April, 2022 at _____ (time) while incarcerated in Lancaster County,
Pennsylvania.


_____

I, _____G H_____, have reviewed a copy of the complaint. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I have personal knowledge of the facts and statements contained within this complaint, and that these facts and statements are true and correct.

Signed on the 25th day of April, 2022 at ___1010___ (time) while incarcerated in Lancaster County, Pennsylvania.

_____G H_____

I, _A.D_____, have reviewed a copy of the complaint. I declare

under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I

have personal knowledge of the facts and statements contained within this complaint, and that

these facts and statements are true and correct.


Signed on the 25th day of April, 2022 at _9:50_ (time) while incarcerated in Lancaster County,
Pennsylvania.


_A.D_____

I, _____S. m_____, have reviewed a copy of the complaint. I declare

under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I

have personal knowledge of the facts and statements contained within this complaint, and that

these facts and statements are true and correct.


Signed on the 25th day of April, 2022 at _a:40_ (time) while incarcerated in Lancaster County,
Pennsylvania.


_____S. m_____

1. _____ CB _____, have reviewed a copy of the complaint. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I have personal knowledge of the facts and statements contained within this complaint, and that these facts and statements are true and correct.

Signed on the 25th day of April, 2022 at _8:35_ (time) while incarcerated in Lancaster County, Pennsylvania.

C·B

I, _____*HC*_____ , have reviewed a copy of the complaint. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I have personal knowledge of the facts and statements contained within this complaint, and that these facts and statements are true and correct.

Signed on the 25th day of April, 2022 at _____*9:00*_____ (time) while incarcerated in Lancaster County, Pennsylvania.

_____*HC*_____

I, __DB_____, have reviewed a copy of the complaint. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that I am over the age of eighteen, that I have personal knowledge of the facts and statements contained within this complaint, and that these facts and statements are true and correct.

Signed on the 25th day of April, 2022 at __9:20__ (time) while incarcerated in Lancaster County, Pennsylvania.

__DB_____